UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

PAUL HITTERMAN, Acting Regional            )
Director of Region 13 of the National Labor )
Relations Board, for and on behalf of the   )
NATIONAL LABOR RELATIONS BOARD,             )
                                            )
            Plaintiff,                      )
                                            )
vs.                                         )   Cause No. 2:21-CV-395-PPS-JEM
                                            )
LIST INDUSTRIES, INC.,                      )
                                            )
            Defendant.                      )

## OPINION AND ORDER

List Industries is in the business of manufacturing and distributing lockers. In June 2021, employees at List's facility in Munster tried to unionize. In quick order, most of the eligible employees signed cards designating Teamsters Local 142 as their bargaining representative in labor negotiations. The National Labor Relations Board claims that, after catching wind of pro-union activity, List's management engaged in some dirty pool by pursuing an unlawful 'nip in the bud' campaign — a phrase used by the NLRB to describe an effort to snuff out the union before it even gets started.

According to the Board, List's on-site operations manager allegedly created the impression that she was surveilling employees' unionization activities and raised the specter of termination in connection with such activities. Then, in the critical weeks leading up to a representation election that would certify the Union, List's company President arrived on the scene. In a series of captive audience meetings, he allegedly

told the employees that voting for a union was futile because List had no intention of negotiating with a union, the employees could lose their jobs and health benefits if the Union was certified, List would be re-instituting pay raises, and the employees were entitled to return of any union cards they had signed. At the same time, List's managers allegedly monitored employees more closely and modified enforcement of work policies to target union adherents. Finally, a few weeks before the election, List suspended and ultimately fired two of the Union's chief adherents on questionable grounds — sending the message that if you rock the boat with union talk, you risk getting sacked. In the subsequent election, the Union lost.

Based on this behavior, the Union filed several charges against List before the NLRB, claiming that List's actions constitute unfair labor practices in violation of the National Labor Relations Act (the "NLRA"). The NLRB investigated the charges and found that List's conduct likely violated federal labor law and filed a consolidated administrative complaint to curtail it. Through the administrative action, the NLRB's general counsel sought an order requiring List to recognize and bargain with the Union pursuant to *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969). In October 2021, a four-day administrative hearing was conducted before Administrative Law Judge Sharon Levinson Steckler. ALJ Steckler subsequently issued a favorable decision for the Board on the merits, finding that List had committed unfair labor practices and entering a recommended order requiring List to bargain with the Union. The ALJ's decision is subject to appeal before the Board itself, followed by a potential enforcement order

2

proceeding in the U.S. Circuit Court of Appeals.

In the meantime, while the NLRB was awaiting the ALJ's decision, it sought interim relief from this Court via Section 10(j) of the NLRA, which authorizes district courts to grant temporary injunctions to maintain the *status quo* while the dispute works its way through the administrative process. The procedure is an odd one. At bottom, it's available because of bureaucratic sluggishness. Because the Board's procedures can take years to conclude, the very point of its administrative action—protecting workers' rights to self-organize and collectively bargain—could be effectively lost without some interim relief. The NLRB seeks such interim relief here; it asks that I preserve the *status quo* that existed between List and its employees before List's alleged unfair labor practices took place. [DE 1; DE 1-2; DE 7.]

I have now reviewed the extensive record from the four-day administrative hearing held in the underlying Board case [DE 7-1, DE 7-2, DE 7-3, DE 7-4, DE 7-5, DE 7-6], the ALJ's decision on the merits [DE 33-1], and arguments raised by the parties in briefs [DE 7, DE 26, DE 28, DE 40, DE 42] and at the hearing held on May 26, 2022 [DE 39]. Based on the foregoing, I conclude that the Director has established that temporary injunctive relief is just and proper under Section 10(j), and an injunction will therefore be issued.

### Procedural Background and Preliminary Matters

Paul Hitterman is the Acting Regional Director of the Thirteenth Region of the

National Labor Relations Board, an agency of the United States, and filed his Petition

for and on behalf of the Board.[1] [DE 1 at 2, ¶ 1; DE 7-2 at 153.] Defendant List Industries,

Inc. is a privately-held corporation with an office and place of business in Munster,

Indiana. [DE 7-1 ("Tr.") at 726; DE 7-2 at 2, ¶¶ 1, 4.] The parties have stipulated that List

is an employer engaged in commerce within the meaning of 29 U.S.C. § 152(2), (6) and

(7), and in conducting its operations annually, List has sold and shipped from its

Munster facility goods valued in excess of $50,000 directly to points outside the State of

Indiana. [DE 7-2 at 2, ¶¶ 2–3.] They further stipulate that the Union is a labor

organization within the meaning of 29 U.S.C. § 152(5). *Id.* at 2, ¶ 5.

     Between June 8 and August 23, the Union filed with the Board six charges (or

amended those charges), alleging List committed various unfair labor practices. [DE 7-4

at 67–152.] On June 8, the Union also filed a petition for a representation election. [DE 7-

3 at 34–35.] The Board referred the charges to the Director. Each filing involved a

separate investigation in which List was given the opportunity to respond to the

allegations, with the "C-case" unfair labor practices charges and "R-case" election

petition investigations proceeding on parallel tracks. [DE 28 at 2.]

     Amid the investigations, on July 15, the R-case election was held. [DE 7-2 at

147–53; DE 7-3 at 25.] Pursuant to a stipulation entered between the parties, eligible

---

[1] For ease of reference, here are the citation conventions I have adopted in the opinion. Citations to the transcripts of the administrative hearing docketed by the Director are identified by "Tr.," followed by the page number labeled on the top right hand corner each transcript page (*i.e.*, the original transcript pagination). However, for all other administrative record submissions, I cite to the page numbers marked in the exhibit on the docket. For example: DE 7-5 at 94, rather than "GC Exh. 2."

employees could vote if they were employed during the payroll period ending June 19. [DE 7-2 at 147–53.] Of the 15 votes cast by 26 eligible voters, five voted for the Union, eight voted against the Union, and two (Jose Avelar and Juan Perez) voted subject to challenge, as they were no longer employed at List. [DE 7-3 at 25.] The challenged ballots were not determinative, and a majority of valid ballots voted against the Union. *Id.* On July 22, the Union filed objections to List conduct that it contends affected the result of the election. [DE 7-3 at 22–23; *see also id.* at 19–21.]

The two cases—the "R-case" and the "C-case"—were later consolidated before the Board.[2] Thereafter, NLRB filed its First Amended Consolidated Complaint. [DE 7-3 at 38–44.] That is now the operative administrative complaint. In that amended complaint, the Director requested a bargaining remedy pursuant to *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969). *Id.*

In October, the parties appeared before ALJ Steckler for a four-day hearing [DE 7-1], after which the parties submitted post-hearing briefs on December 17 [DE 28 at 3; *see also* DE 7-1 at 1119.] On December 21, just after the matter was fully briefed to the ALJ, the Director filed the pending Petition for a Temporary Injunction Under Section 10(j) of the NLRA. [DE 1.] On April 18, 2022, ALJ Steckler entered her Decision and Recommended Order on the merits of the Board's claims. [DE 33-1.]

---

[2] NLRB Cases 13-CA-278248, 13-CA-278670, 13-CA-278745, 13-CA-278746, 13-CA-278985, 13-CA-279284, and 13-RC-278226 are consolidated in the matter styled *List Industries, Inc. & Int'l Brotherhood of Teamsters Local Union No. 142*, NLRB Case 13-CA-278248, *et al.* [*See* DE 7-3 at 38–44 (First Amended Consolidated Complaint); *see also id.* 58–64; DE 7-4 at 67–152.]

**Findings of Fact**

**Background Facts**

Since June 2019, List has operated the Munster facility as a distribution center warehouse for the manufacture and non-retail sale of lockers. [DE 7-2 at 2, ¶¶ 1, 4.] While List does its manufacturing and distribution at various locations around the country, the company centralizes some functions at its corporate headquarters in Deerfield Beach, Florida. [Tr. at 574, 687, 784–85, 847; DE 33-1 at 4.] The company is led by President Herbert "JR" List, Jr., who I will refer to in this opinion as "Mr. List" to differentiate him from the company bearing his name. *Id.* List's Director of Operations is Christian DeTombeur, and its Chief Financial Officer is Eric Bello. *Id.* DeTombeur has day-to-day responsibility overseeing List's six distribution centers, including the Munster facility. [Tr. at 847.] Bello assumes primary responsibility over List's finance, accounting, information systems technology, and Human Resources teams. [Tr. at 687.] DeTombeur and Bello both report to Mr. List. [*See* DE 33-1 at 4.]

At the Munster facility, absent site visits by her superiors, Operations Manager Amanda Lieberman serves as the highest ranking official, reporting up to DeTombeur. [*Id.*; Tr. at 945–46; DE 7-2 at 4, ¶¶ 10–11.] Since March 2021, Lieberman's duties consist of training, hiring, and supervising the work and assignments of warehouse employees at the Munster facility. [Tr. at 276, 945–46, 997; DE 7-2 at 4, ¶ 10.] At all material times, Mr. List, DeTombeur, and Lieberman served in their respective positions as List's supervisors and agents within the meaning of the NLRA, 29 U.S.C. §§ 152(11), (13).

The Munster facility has three main "working areas": assembly, packaging, and the dock ("shipping and receiving"). [DE 7-2 at 2, ¶ 8.] While total headcount can fluctuate over time, during the relevant period, List employed approximately 26 workers in full-time or part-time assembly, warehouse, production, shipping, and order processing roles (exclusive of office clerical employees, guards, and supervisors). [*See* DE 7-2 at 5–9; DE 7-3 at 41.] I find that the following employees at List's Munster facility constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the NLRA (the "Unit"):

> All full-time and regular part-time assembly employees, warehouse employees, production employees, shipping clerks and order processors employed by List Industries, Inc. ("List") at List's facility currently located at Warehouse Suite 2W, 101 45th Street in Munster, Indiana; excluding, all other employees, office clerical employees, and guards and supervisors as defined in the Act.

**The First Talk of Unionization**

In late May 2021, two warehouse employees, Juan Perez and Jose Avelar, discussed the prospect of unionizing the employees in the Unit. [Tr. at 113–15, 283–86.] On May 25, 2021, Avelar texted Harvey Jackson, Teamsters Local 142's president and business agent, to tell him that he now worked "for a company in Munster which happens to be non-union." He relayed that the employees appeared "ready to sign cards and get this company unionized." [DE 7-5 at 1; Tr. at 38–42.] The pair talked later that day about employee concerns, including pay raises and general working conditions

at the facility. [Tr. at 43.] Jackson had known Avelar and Perez for several years, as they had both worked for various companies with Union contracts. *Id.* at 42, 85–89, 103–05.

Juan Perez was one of the first employees at the Munster facility in June 2019. He helped prepare the facility to open for business and was eventually tasked on the assembly line, reporting directly to Robertson. *Id.* at 278–80. Perez could assemble lockers quicker than anyone on staff and was at the top of List's national assemblers chart. *Id.* at 345. For his effort, around March 2021, Robertson rewarded Perez with a promotion to line lead, which raised his pay by $1.00 per hour. *Id.* at 279–80. From 5:30 a.m. to 2:00 p.m., Monday through Friday, Perez played a key role supervising eleven to twelve assembly lines at a given time. *Id.* at 281–82. He opened the facility each morning and supervised the lines, ensuring they had needed parts and equipment and were moving on pace. *Id.* Shortly after his promotion, Robertson left List and Perez began reporting directly to Lieberman. [*See id.* at 276–77; DE 33-1 at 33.] Until June 2021, Perez had an unblemished disciplinary record. [Tr. at 350.]

Jose Avelar started working at List in March 2021, after Perez notified him about a job opportunity. *Id.* at 108–09. They had worked together previously at a place where the Teamsters Local 142 represented the employees. [*Id.* at 114–15, 284–86; *see* DE 33-1 at 6.] Although List hired Avelar to be a Class A interstate commercial truck driver, for most of the time he worked at the Munster facility, List did not have an interstate registered plate authorizing him to cross state lines. So he instead worked as a "floater" in the warehouse. [Tr. at 108–09.] As a floater, Avelar would receive daily assignments

from Lieberman. *Id.* He did "any work that was needed" around the facility, ranging from cleaning and sweeping to assisting on the assembly line to cleaning the break room. *Id.* In this role, Avelar, like Perez, had exposure to and worked alongside a range of workers at the Munster facility. *Id.* at 111 (testifying that he worked alongside assembly, warehouse, and production and shipping employees).

Lieberman first learned of employees' organizing activities on May 26. [DE 7-2 at 4, ¶ 12.] She was told by several employees that they had been approached by Avelar and Perez about signing cards and attending meetings. [*Id.*; Tr. at 946–47.] DeTombeur and Mr. List became aware of the activities by early June. [Tr. at 785, 827, 921–22, 926.] After learning of the union activity, Lieberman asked employees whether they were part of the union campaign or had been approached to sign a card in support of the Union. *Id.* at 116, 121–25, 329–33. According to Avelar, Lieberman made statements to an employee, Lisa Williams, alluding to the possibility of Williams' termination because she did not have "90 days" on the job and could be let go. *Id.* at 124–25. For her part, Lieberman testified that she never questioned any employee about union organizing. *Id.* at 950–51.

In their organizing efforts, Avelar and Perez discussed unionization with various List employees. *Id.* at 47–50, 133–34, 285–86, 290–94. From June 6 to 7, they collected signed authorization cards from various employees, attended Union meetings, and discussed reasons for unionizing, including better wages. *Id.* Perez testified that wages

and benefits were a key concern for the employees, as some could not afford to pay for insurance. *Id.* at 293–94. As they signed cards, Avelar would add employees to a private text messaging group to keep them informed about the campaign. *Id.* at 135–36.

### Lieberman and Avelar's June 8 Conversation and the Fallout From it

On June 8, Lieberman and Avelar had a conversation about employees' organizing activities and rumors that Avelar had been involved in promoting the Union. [Tr. at 137.] Avelar testified that he learned that Lieberman had been "interrogating" employees about union activities, so he told her that she was not allowed to do that during an organizing campaign. *Id.* at 137–41. In response, Lieberman stated that she knew it was him who was "involved in this campaign," and that she could "fire [him] right now if [she] wanted to," because he did not have "90 days in." *Id.* He testified that the conversation ended at that point. *Id.* at 139.

In Lieberman's account, various employees told her that Avelar was "harassing" them about unionization — more specifically, he had approached them during work hours about signing authorization cards and attending Union meetings. *See id.* at 952–61, 1024, 1036–37, 1095–96. During their conversation, she told Avelar that employees had been approaching her about these activities; but she would not identify who told her the information, viewing the source of the information as "confidential." *Id.* at 951–955, 1014–15. Avelar denied any involvement in the Union. *Id.* Then, Avelar asked if she could fire him for being involved in the Union. She replied that she could not fire someone for involvement in union activities, but confusingly she also told him

that employees in their first 30 days on the job were on probation and could be fired. *Id.* at 953–54. The ALJ found Avelar more credible than Lieberman and credited his version of events. [DE 33-1 at 13.]

Avelar texted Union President Jackson about the incident informing him that someone from "our group" had "narced" on him. [DE 7-5 at 31.] He thought he would be fired for his role in the campaign: Lieberman had "threatened [him] with [his] job." *Id.* Jackson responded to the news with a petition for election and an unfair labor practice charge that day, expediting the petition because of the alleged unfair labor practice. *See id.*

List reacted with an aggressive full-court press. While Perez and Avelar continued collecting authorization cards—eventually obtaining cards from most Unit employees by June 9—List posted anti-union flyers and began contacting employees about the campaign at their personal email addresses. [Tr. 126–33; 157–58; *see also* DE 7-5 at 8–28.]

### Mr. List's First All Employee Meeting

On June 11, Mr. List arrived on the scene and gave a speech to Munster facility employees. [*Id.* at 154–55, 295, 423; DE 7-2 at 4, ¶ 19.] While Mr. List had never previously spoken with the Munster employees on the warehouse floor, on this occasion he called everyone into the dock area for an all-hands meeting. [Tr. at 155, 295–97, 423.] He testified that he read a prepared speech "word for word" and denied

making any statements discouraging employees from engaging in union activities. [*Id.* at 786–88, 793, 803; DE 7-6 at 12–29.]

At the top, Mr. List's remarks stated that the company would "take all steps our management and loyal employees legally can do to keep the Teamsters out. Our entire company is union-free, and we intend to stay that way." [DE 7-6 at 12–14.] The prepared remarks included various disparagements of the Teamsters, such as a statement that "the Teamsters are trying to get in here so that they can get [the employees'] money by way of dues, initiation fees, fines and assessments." *Id.* at 15. Mr. List also addressed "what could happen if [employees] decide to heck with what [Mr. List was] saying and go ahead and get yourself a union, *god forbid*." *Id.* at 20 (emphasis added). He said that one possibility was a deadlock in negotiations with the Union, which could result in the Union calling a strike. *Id.* at 23–24. Workers who went on strike "may get [their job back," but "not necessarily," and it was "anyone's guess" when workers who had been replaced could get their jobs back — indeed, "in some situations, strikers have lost their jobs permanently." *Id.* at 24–25.

Addressing employees who had signed or were considering signing authorization cards, Mr. List's remarks stated that although employees "have a right to sign a card for any organization," including the Union, "it would be one of the biggest mistakes [an employee] could make" to "take [an authorization card], sign it, and give it back to the Union." [DE 7-6 at 16, 19.] The cards were "a blank check" to the Union, which he feared some employees "may already have signed." *Id.* at 17, 19. He wrapped

12

up by acknowledging that the employees wanted "more money and . . . better benefits,"
but proposed that List could "best achieve our goal to improve ourselves by working
together on the same team instead of . . . going outside and getting yourself a dues-
collecting Teamsters disorganizer to start trying to tell us how to run this operation." *Id.*
at 26–27.

In contrast to Mr. List's version of events, Avelar and Perez testified that he
made several additional statements during the meeting, none of which appear in his
prepared remarks. [*See, e.g.*, Tr. at 423.] Avelar testified that after giving a brief history
of the company's history, Mr. List told the employees "that the union is nothing but a
bunch of mobs, crooks, gangsters, and thugs just after our hard earned money," *id.* at
154–55; that he would do "whatever it takes for his company . . . not to be unionized;"
that he would "not negotiate with crooks, thugs, or mobsters," *id.* at 155; that if
employees went on strike "you'll be easily replaced;" and that the Union would "leave
you out to dry," *id.*

Perez corroborated Avelar's account of Mr. List's address, testifying that Mr. List
strayed from his prepared remarks in the employee meeting. According to Perez (and
consistent with Avelar), Mr. List said that "none of his companies are union, never will
be, and he will do whatever it takes to keep it that way," and that if employees went on
strike, they would lose their jobs. *Id.* at 295–96. He added that List "would not negotiate
with thugs and gangsters" like the Teamsters. *Id.* Another List employee, Frankie Leggs,

13

also corroborated these accounts, testifying that Mr. List said that he was "not with the union," "will fight" with the Union, and there would be "no negotiation" with the Union. [Tr. at 423.] However, Leggs stopped short of saying that there was a specific threat of permanent job losses, testifying that Mr. List said that "if you ever go to a strike, there's a possibility that you will not have a job." *Id.*

Once again, in weighing the competing testimony, ALJ Steckler largely sided with the employees' account of what was said over Mr. List's. For example, the ALJ credited Leggs' statement that Mr. List said job loss was a "possibility," and also credited statements from Avelar and Perez that Mr. List said that the Union would leave employees "out to dry." [DE 33-1 at 18.] She further discredited Mr. List's blanket denials, made in response to leading questions, regarding his off-the-cuff statements about job loss, strikes, and the consequences of deadlocks in negotiations. Mr. List had not reviewed the speech and could not testify to what the remarks *did* say without reviewing their contents at the hearing. [*Id.* at 17–18; *see also, e.g.*, Tr. at 790–92.] She further noted that Lieberman, who was present during the speech, did not corroborate Mr. List's denials of verbal statements made outside the scope of his prepared remarks. [DE 33-1 at 18.] In contrast, ALJ Steckler found the government's witnesses credible because they testified based on personal knowledge, corroborated each other's accounts of what Mr. List said, and covered a variety of topics that were in the prepared remarks. *See id.*

After the speech, a FAQ sheet was distributed to the employees, in which Mr.

14

List "remind[ed]" them that their 401(k) retirement benefits were provided to all employees "without any union involvement whatsoever." [DE 7-2 at 89–91.] In not-so-veiled terms, the FAQ sheet stated that if the Union was allowed to "come in," there was "no guarantee [that employees'] retirement benefits will be kept." *Id.* at 91. Although retirement benefits would be "up to negotiation," employees were told that List was "inclined to reject" any request from the Teamsters to "sign on for its Central States Pension Plan," and "absolutely nothing in the law requires [List] to agree to that or any other plan." *Id.*

**<u>Evidence Regarding List's Employee Surveillance</u>**

List's Director of Operations, Christian DeTombeur, set up a trip to Munster starting that Monday, June 14. [DE 7-5 at 49–55.] He came in response to the organizing activity for a two-week site visit, setting up a workstation on the warehouse floor adjacent to Avelar and Perez. [*Id.* at 58–59; Tr. at 162–63, 314–15, 434, 848–49, 922–24, 928, 936, 1070–72.] In contrast to his prior visits to the Munster facility, this time DeTombeur spent the vast majority of his time on the work floor. [Tr. at 320–21, 433.] While he had never previously set up his laptop on the Munster warehouse floor, DeTombeur explained that this time he had picked his location on the work floor because he could see the full assembly area, packaging area, and unassembled packaging area, "which is where the majority of our employees work." *Id.* at 867, 913, 1068. From his makeshift setup, DeTombeur could view business programs on one

screen and a real-time security video feed on the other screen. *Id.* at 868. He testified that due to a technical issue, he could not view, nor had access to view, the facility's security footage from his workstation in June 2021. *Id.*

By contrast, Avelar testified that he observed the security cameras had been moved to face his bolt sorting station and that he saw a video of himself on DeTombeur's computer screen. *Id.* at 160–64, 225–26; *see also id.* at 326–27. Perez also testified that he could see Munster facility employees on DeTombeur's screen, with separate cameras facing the assembly line. *Id.* at 317, 324–25. Lieberman testified that the cameras aimed toward Avelar's bolt sorting station were not moved, *id.* at 1006, which is supported by comparator photos submitted by List, *see* DE 7-6 at 43–46.

The ALJ discredited nearly all of DeTombeur's testimony. She found the timing of DeTombeur's visit "suspect," found that his testimony that he visited the facility due to organizing activities [Tr. at 928] was an "admission against [List's] interest," and discredited any other reasons for DeTombeur's visit. [DE 33-1 at 23.] She further credited evidence that DeTombeur had never before "had this set-up in the Munster facility" like he did on this occasion. *Id.* And she disbelieved his testimony that he could not access Munster security footage during the relevant period, and instead found that DeTombeur "openly observed" employees on the work floor with his computer. *Id.*

**Stricter Enforcement of the Company Cell Phone Policy**

Shortly after DeTombeur's arrival in Munster, on June 14, Lieberman and DeTombeur called a second employee meeting concerning stricter enforcement of the

company's policy against using cell phones and headphones while on the job. [DE 7-2 at 4, ¶ 20.] For safety reasons, Lieberman explained, she would be enforcing List's cell phone policy: employees needed to put cell phones and earbuds away and could not use them on the warehouse floor. [Tr. at 169, 298; 990–93.] Avelar testified that he responded to the announcement by stating that Lieberman could not "enforce a policy during a campaign," to which DeTombeur replied, "We're the company. We'll enforce the rules as we go and implement the rules as we go." *Id.* at 169, 298.

Lieberman testified that in the weeks leading up to the meeting, employees' use of phones in the warehouse had become "excessive." She noted that the facility had its own cell phone policy, posted on the bulletin board, and she regularly reminded employees about it. [*Id.* at 990–92, 1054; DE 7-2 at 76–79.] Lieberman denied that ongoing organizing activities were the reason she sought to enforce the policy; she had been reminding employees about this regularly prior to the campaign. [Tr. at 993.] However, there was only one documented account of a verbal warning under the policy, which happened in 2020. [*Id.* at 994; DE 7-2 at 145–46.]

Employees testified that the cell phone policy had not previously been enforced; employees had regularly called, texted, and used their phones to play music, and Lieberman was aware of this. [Tr. at 301–02, 426–28, 477.] While Lieberman would tell the employees to turn down music on occasion, *id.* at 429, according to the employees, Lieberman permitted them to listen to music on their phones with one earpiece. *Id.* at

302, 428–29. ALJ Steckler discredited Lieberman's denials that she started more rigorous enforcement of the cell phone policy because of the union activity, noting that Lieberman gave conflicting answers about enforcement of the policy and that her denials about the reason for heightened enforcement were made in response to leading questions. [DE 33-1 at 28.].

### The Second All Employee Meeting

Another all-hands meeting followed on June 15, this time with Mr. List again in attendance. [Tr. at 183–85, 309–11, 431–32; DE 7-2 at 4, ¶ 21.] After DeTombeur made some remarks about his "personal experience" working at unionized companies, Mr. List made a statement. [Tr. at 182–83, 310, 796–98.] He asked if employees were aware that a COVID-induced pay freeze had been lifted earlier that year, *id.* at 241, 796–97, and noted that two employees were up for annual raises, *id.* at 183, 241, 310–11. One of the two employees identified by Mr. List as being eligible for an increase was Perez, although Mr. List was plainly mistaken about that. In any event, the end of the "wage freeze," *see id.* at 797, 805–06, amounted to List returning to its pre-pandemic policy of reviewing employees for compensation increases on an annual basis, and was put in place by March 2021. *Id.* at 241, 311, 354–55, 466, 798–89. Mr. List testified that "a few," or "maybe like half" of the employees raised their hands, indicating that they were aware that the company had previously announced the end of the "wage freeze" in March 2021. [Tr. at 797, 805–06.] Avelar testified that he had never previously heard of an employee receiving "annual raises" prior to Mr. List's announcement that Perez and

another employee were "up for a raise," *id.* at 185, and Perez had never received an email or announcement about raises after wages were frozen, *id.* at 397–98. After Mr. List's remarks, DeTombeur explained how the company's annual review policy worked and List's return to the practice of reviewing employees' performance and wage increases on their employment anniversaries. [*Id.* at 797, 917–19; *see also* DE 7-2 at 62–64.]

Mr. List testified that he did not say anything about the wage freeze, unions or unionization at the June 15 meeting; he just talked about his review of the annual review policy. [Tr. at 796–97, 813.] However, Perez testified that Mr. List ended the remarks by saying that the Union was "not good for" employees and that it was in their "best interest . . . to vote no." *Id.* at 311; *see also id.* at 185. Mr. List further stated that if employees had signed authorization cards, they had a right to get the card back. *Id.* at 184–85, 311, 432. Avelar testified that Mr. List's statements at this final meeting had a "big impact" on his coworkers. *Id.* at 186. In fact, following the meeting, at least four employees that had signed cards approached Avelar indicating that they wanted their cards returned or that they no longer supported the unionization campaign. *See id.* at 185–191.

Once again, ALJ Steckler discredited Mr. List's testimony relating to the second 'all-hands' meeting, in particular his denial of statements about employees getting back their authorization cards and List's estimate of the number of employees who indicated

that they had heard about pay raises prior to the June 15 meeting. The ALJ found these statements to be unreliable noting that in the employees' version of the meeting, Mr. List incorrectly identified Perez as eligible for a raise. [DE 33-1 at 31.] The ALJ further pointed out that List did not provide any documentation demonstrating that it had notified employees about reinstating annual raises. *Id.* at 32.

Later that week, the Union met with Avelar, Perez, and several other List employees. [DE 7-5 at 6.] Jackson testified that the meeting was held during the week, rather than on the weekend per the Union's typical practice, because the employees had expressed "urgency over some captive audience meetings" and "literature that had been given out by the company." [Tr. at 67.] Employees relayed to Jackson that they were "scared . . . that they were going to lose their jobs." *Id.* at 68. In response, Jackson proposed writing a letter to List identifying the employees who were on the organizing committee, to the extent they were comfortable revealing the information. *Id.* at 69, 338. Avelar, Perez, and five other employees volunteered for the organizing committee, and Jackson hand-delivered the letter to DeTombeur on the afternoon of June 17. [Tr. 927–28; DE 7-5 at 42.] Although the letter did not expressly inform List that the Union had obtained signed authorization cards from a majority of employees in the Unit, Jackson had received all the signed cards no later than June 12, and therefore believed that the Union held a card majority. [Tr. at 78–82; *accord* DE 7-5 at 8–28.]

**The Termination of Avelar and Perez**

The final entries in this saga came when List, just weeks ahead of the election,

suspended Avelar and Perez, leading to their eventual terminations. The circumstances of both employees' suspensions and terminations are convoluted and fiercely disputed by the parties. On the evening of June 14, Perez sent a text message from his personal cell phone to the text group for employees supporting the Union campaign. [Tr. at 340–41; DE 7-2 at 114–15, 118–19.] Earlier that day, Lieberman had distributed a "Get the Facts" sheet highlighting various drawbacks of unionization. [DE 7-2 at 117.] Avelar encouraged the employees to "respond to [Lieberman's] email and say stop using my email for anti union propaganda." *Id.* at 118. Keith Hunt responded, "I just told her ass I'm not interested in what she got going on that has nothing to do with me." [*Id.*; Tr. at 211.] Perez later replied that Lieberman "has too much time on her hands . . so go over there and tap that ASS and keep her busy..LoL." [DE 7-2 at 119.] This elicited responses from Tyler Demps, who responded, "YALL WILDIN" with several poison emojis, and Lisa Williams, who asked Perez to "please take me off the group chat." [*Id.*; *see also* DE 7-5 at 46–48.] Demps later requested to be removed, as well, suggesting that Avelar "start a new [text group] with active members." [DE 7-5 at 48.]

Lieberman testified that employees James Hardy, Lisa Williams, and Jonathan Diaz informed her about the texts. [Tr. at 962, 1026.] She confirmed that the telephone number that sent the untoward comment belonged to Perez. *Id.* at 964–65. Very early in the morning on June 17, Lieberman obtained screen shots of the texts and sent them to her work email. [*Id.* at 1028–29, 1074–75; DE 7-2 at 121–27.] She forwarded the text chain

to DeTombeur, who in turn forwarded it along to Mr. List and Bello with the description: "JR – below is the texts being sent to the pro-union text group in Munster Amanda told you about yesterday. *Not sure if there is anything there that constitutes sexual harassment.*" [DE 7-2 at 122 (emphasis added).]

On the morning of June 18, Lieberman sent HR Assistant Cheri Rodriguez an email stating that she wished to file a sexual harassment complaint against Perez due to his "explicit comments" in the text thread. [Tr. at 505; DE 7-2 at 128–34.] Rodriguez concluded the message violated "several of [List's] policies," finding that the statement tended to diminish Lieberman's authority over the group of employees and was "just disrespectful." [Tr. at 508.] Bello later emailed Mr. List, DeTombeur, and List's counsel about the situation, characterizing Perez as "one of the *ring leaders*" of the organizing activity. [*See* DE 7-2 at 120 (emphasis added).]

DeTombeur asked Perez about the texts shortly after Lieberman filed her formal complaint. [Tr. at 1083.] DeTombeur showed him the message and asked if Perez had sent it. Perez was initially nonresponsive, but after being asked a second time replied, "I'm not sure. I don't remember." *Id.* at 338–39, 377, 856. DeTombeur testified that he said it was a "yes" or "no" question (which Perez denied), and that at no time did Perez apologize or deny sending the message. *Id.* at 377, 856–57. He then told Perez that he was suspended and needed to leave the building, proceeding to walk Perez down to his workstation and out the door, right past the employees working on the shop floor. *Id.* at 376–77, 339–40, 855–56, 929.

22

DeTombeur informed Rodriguez that Perez did not deny sending the text, and Rodriguez determined that she did not need to speak with Perez again as part of her sexual harassment complaint investigation. [Tr. at 510–11.] Rodriguez concluded that Perez violated several List policies, including its Sexual harassment Policy, warranting his termination. [*Id.* at 514–19, 614; DE 7-2 at 39. *See generally* DE 33-1 at 36–38.] Rodriguez's findings were not reduced to a written report and Bello and DeTombeur made the final decision to terminate Perez. [Tr. at 689, 736–38.] Bello testified that Perez's support for the Union played no role in his decision, noting that the text was sexual in nature, Perez never denied sending it when given the chance, and Lieberman was disrespected. *Id.* at 689–91. He relied on the recommendation of the "HR team," which found several policy violations. *Id.* at 699–701.

On June 22, following her recommendation to terminate Perez, Bello instructed Rodriguez to contact Perez regarding the termination. *See id.* at 342, 540–41. Rodriguez called Perez and informed him that he was being terminated for making an offensive comment. This confused him because he had previously been told by DeTombeur that he was being suspended for sexual harassment. *Id.* at 342. Rodriguez confirmed the termination was based on an offensive comment. [Tr. at 383–84.] List's internal records reflect that Perez was terminated due to "inappropriate text messages (of sexual nature) sent in a group chat with other employees regarding manager, Amanda Lieberman." [*Id.* at 542; DE 7-2 at 113.]

On June 18, Lieberman also had a series of conversations with employee Xavier Oquendo. [*See* Tr. at 1087, 1103.] In the first discussion, Oquendo said that Avelar planned to get a permit for "a pro-union protest to single out anti-union people at the Crown Point Square." *Id.* at 1103. Lieberman testified that she lives "within walking distance of the Crown Point Square" in Crown Point, Indiana. *See id.* at 977. Two other employees, James Hardy and Trebor Medina, also told Lieberman that they heard Avelar talking about a "protest that he wanted to have." *Id.* at 980–81. Lieberman told Rodriguez about this conversation, and Rodriguez instructed her to have Oquendo make a written statement and send it to Rodriguez via email. *Id.* at 521.

In the second discussion, Oquendo told Lieberman that he had more information to provide about his conversation with Avelar. He then wrote a statement indicating that Avelar approached him asking if "your girl Ms. Lieberman [is] suicidal yet?" [DE 7-2 at 111–12.] Avelar reportedly added that "she's gonna be, after what I'm gonna do," and that he had "filed for a permit to [*sic*] freedom of speech in Crown Point so that I can protest and expose people who are anti-union." *Id.* This statement made no mention of the precise location in Crown Point where Avelar planned to stage the protest.

Mr. Oquendo initiated the final conversation in Lieberman's office, telling Lieberman that he was planning on being in Crown Point Square for a wedding that weekend. *Id.* at 1107–08. Lieberman testified that Oquendo said he was "scared for" her because "Avelar stated that he was going to harass [Lieberman] until [she] committed suicide," but she did not recall him ever confirming *when* the protest would take place,

24

nor does the written statement suggest that Avelar intended to harass her until she committed suicide. [*See id.* at 1108–09; DE 7-2 at 111–12.] Oquendo did not testify at the administrative hearing and quit employment at List for personal reasons. [*See* DE 33-1 at 41.] Lieberman knew that Oquendo had a negative "stance on the union." She also knew that Oquendo was in a relationship with the niece of another employee, Danny Ochoa, who had a pro-Union stance, and that there had been "friction" in the family as a result. [Tr. at 1085–87.] While this information was certainly relevant, Lieberman never mentioned it to List's HR team. *See id.* at 1086.

List started investigating the claims. Rodriguez testified that Lieberman was upset about the statement and expressed that she did not feel safe at work. *Id.* at 525–26. Through casual conversation, Avelar knew that Lieberman lived in the Crown Point area. *See id.* at 526. However, there is no evidence that Avelar knew Lieberman's address or planned to protest adjacent to her home. As with Perez's text, Avelar's alleged statement "shocked" Rodriguez. *Id.* at 507, 523. Without speaking to Avelar, Rodriguez recommended Avelar's suspension based on her review of Oquendo's written statement and her discussion with Lieberman. *Id.* at 524. Rodriguez did not take any immediate action to address Lieberman's alleged concern for workplace safety beyond informing Lieberman that she would discuss the matter further with Bello. [Tr. at 529–30.]

At some point in the process, Lieberman informed DeTombeur about Oquendo's written statement. *Id.* at 858–59. He investigated the claims following Rodriguez's recommendation. *See id.* at 762, 882. DeTombeur did not confirm where in the city Avelar allegedly planned to conduct his protest, did not know whether Avelar had obtained a permit, and could not recall whether he spoke with Oquendo about his statement. *Id.* at 938–39. However, per Lieberman's report, he believed that the protest was going to be held "ten minutes" from Lieberman's home. *Id.* at 938. DeTombeur "took [Oquendo's] complaint a hundred percent as accurate," and confirmed that it formed the basis for the decision to suspend Avelar. *Id.* at 884–85.

However, DeTombeur did question Avelar about the statement. [Tr. at 881–82.] Avelar denied making the statement, attributing it to "hearsay." Leggs, who attended the meeting as an employee witness, corroborated Avelar's denial. *Id.* at 249 ("I did not"), 471 ("I have not said anything like that. . . . Who would say something like that?"). DeTombeur testified that Avelar simply replied that the statement was hearsay and refused to answer whether he had made the statement. *Id.* at 862–63. Based on Avelar's response, in the spur of the moment DeTombeur told him that he was suspended, and that HR would be in touch with him next week. *Id.* at 863. He then walked Avelar past the assembly line and out of the building. *Id.* at 198, 929.

Less than two hours passed between Lieberman's initial complaint and Avelar's removal from the facility. [Tr. at 586–87.] In this time, Rodriguez did not speak with any employees besides Lieberman, DeTombeur, and Bello about Avelar's alleged statement.

26

*Id.* at 587, 590–91. The only written statement in Avelar's "investigation file" came from Oquendo. *Id.* at 589. Nor did Rodriguez instruct DeTombeur to speak with Oquendo. *Id.* at 591. And, following the suspension, she did not speak with Oquendo prior to Avelar's formal discharge. *Id.* at 590. Avelar's suspension took effect on a Friday, and the following Monday, June 21, Rodriguez promptly recommended his termination. *Id.* at 589–91. Despite taking action to immediately remove Avelar, the investigation was paltry and Rodriguez confirmed that she did not take *any contemporary notes* documenting the process. *Id.*; *see also id.* at 586–87.

After DeTombeur suspended Avelar, he was not involved in the termination decision. [Tr. at 865–66.] Rodriguez concluded that his alleged "suicide threat" violated several policies and recommended termination, but testified that Bello made the ultimate decision. *Id.* at 537–38, 620, 722–23. Bello followed the recommendation, finding that DeTombeur's account of his conversation with Avelar amounted to "not cooperating in an investigation," which was tantamount to "insubordination" under the policy. *Id.* at 715–16, 741–42. On June 23, Rodriguez contacted Avelar to tell him that he was being fired. *Id.* at 201. Avelar said that List had conducted a "one-sided investigation" and requested that List put its decision in writing. *Id.* at 202. Rodriguez ended the call at that point. *See id.* at 202–03, 594. Nobody contacted Avelar after the decision to investigate further, request a written statement, or provide Avelar with a copy of Oquendo's written report (which Avelar never had a chance to see in the course

of the investigation). *Id.* at 204–05. List's records reflect that Avelar was terminated for "misconduct," citing the Oquendo's statement and the "perceived threat towards [Lieberman]." [DE 7-2 at 110–12.]

List has handled employee discipline in a handful of similar situations. [*See* DE 33-1 at 45–50.] The closest comparator is Mario Vasquez, who was investigated for a pattern of sexual harassment. Vasquez was accused of harassing his female coworker through at least twelve verbal remarks. [Tr. at 408–09; DE 7-2 at 136–42.] Vasquez would send the coworker direct messages via text and Facebook Messenger, and on one occasion expressed his desire for her to wear "Daisy Duke" shorts to work. *Id.* at 408–09, 413–14. List's investigation collected a statement from Vasquez. He denied that he said anything offensive and denied that the coworker told him to stop making offensive remarks. However, he was willing to make some kind of apology. [DE 7-2 at 138–39.] List also spoke with other employees, all of whom corroborated the female coworker's statement. [*See* DE 7-2 at 140–42.] Vasquez was suspended without pay for *one day*, along with a written warning that included a threat of termination for any similar conduct in the future. [Tr. at 551–52, 637; DE 7-2 at 135.] The suspension did not take effect until *three days after* the initial complaint, and Vasquez was allowed to work pending the investigation. [Tr. at 637; *see also* DE 7-2 at 135–42.] Rodriguez testified that because Vasquez expressed remorse for his actions after learning that they made his coworker uncomfortable, lesser punishment was appropriate in that case. *Id.* at 553–55. In response to several leading questions, she stated that Vasquez's discipline did not

involve a sexually inappropriate comment to a supervisor, unlike Perez's text, and
Vasquez did not frustrate the investigation, unlike DeTombeur's account of his
conversation with Avelar. *See id.* at 544–45. In another case, List suspended and
ultimately terminated an employee, Robert Drayton, because he directed expletive-
filled tirades at Lieberman and a coworker. *Id.* at 346–50, 450, 447. Drayton had no
remorse for his actions; but after Lieberman fired him, she permitted him to gather his
belongings and leave unescorted. *See id.* at 347, 1084.

On the unlawful discharge claims, ALJ Steckler again discredited much of the
testimony from List's witnesses. Weighing the evidence, she concluded that Lieberman,
DeTombeur, Bello, and Mr. List did not testify credibly or reliably about the
suspensions and terminations. More specifically, on a host of embedded factual
disputes, the ALJ found that List's witnesses improperly hedged answers, gave shifting
answers that did not stand up on cross-examination, offered inconsistent testimony, and
offered testimony in response to leading questions. [*See* DE 33-1 at 50–51, 61–63.]

**The Election**

On June 22, as the election neared, the Union and List agreed that the payroll cut-
off for eligible voters would be those employed during the period ending June 19, 2021.
[DE 7-2 at 147–153.] The Union held another meeting on June 27, but only three
employees showed up, excluding Perez and Avelar. [Tr. at 72, 218; DE 7-5 at 7.] The
Union President (Jackson) noted that "folks were scared" and Avelar believed that the

terminations had a big impact on employee turnout. [*See* Tr. at 72, 218.] Jackson also observed that he could not find an employee to serve as an election observer — an issue he had never previously encountered. *Id.* at 74. Whether done by lawful methods or otherwise, List was ultimately successful in defeating the union efforts; out of 15 total ballots cast, only five were in the Union's favor. [DE 7-3 at 25.]

## Discussion

### A.   Legal Standard for 10(j) Preliminary Injunctions

Section 10(j) enables the Board "to petition any United States district court . . . for appropriate temporary relief or restraining order." 29 U.S.C. § 160(j). Section 10(j) gives the Court "jurisdiction to grant the Board such temporary relief or restraining order as [the Court] deems just and proper." *Id.* While Section 10(j) does not confer jurisdiction to determine the merits of the underlying administrative action, evaluating whether relief is "just and proper" involves a "predictive" exercise that hinges on "what the Board is likely to do with the case." *Bloedorn v. Franciso Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001). Although my authority is broad in fashioning an appropriate remedy, one thing that I cannot do is order a new election. [DE 40, 42.] Only the Board can order that remedy. *Id*.

"The goal [of Section 10(j)] is to protect the integrity of the collective bargaining process and to preserve the Board's power to provide effective remedies for violations despite the 'notoriously glacial' pace of Board proceedings." *Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566, 570 (7th Cir. 2011) (citing *Kinney v. Pioneer Press*, 881 F.2d 485,

491 (7th Cir. 1989)). Importantly, in crafting Section 10(j), Congress explained that "[t]ime is usually of the essence" in labor disputes. *Pioneer Press*, 881 F.2d at 488 (citing S.Rep. No. 80–105, 80th Cong., 1st Sess. 8 (1947)). This precious time slips away over years of "relatively slow" administrative procedures, after which the Board must obtain an enforcement order from a U.S. Circuit Court of Appeals. *Id.* In the absence of temporary injunctive relief, these delays can undermine important legislative policies, namely, the "prompt elimination of the obstructions to the free flow of commerce" (which get reinforced by years-long delays) and protecting and promoting "free and private collective bargaining" (which, absent interim remedies targeting alleged unfair labor practices, tend to wither over time). *Id.* If this "delay [is] long enough, or the sin grave enough, the Board's order might come too late to do any good." *Id.* at 487.

Interim relief is "just and proper" when: (1) the Director has no adequate remedy at law; (2) the labor effort will be irreparably harmed without interim relief, and that potential harm outweighs potential harm to the employer; (3) public harm would occur without the relief; and (4) the Director has a reasonable likelihood of prevailing on the merits of the underlying administrative complaint. *Harrell v. Am. Red Cross of Am. Blood Servs. Region*, 714 F.3d 553, 556 (7th Cir. 2013); *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1566–67 (7th Cir. 1996). The Director must prove no adequate remedy at law, public harm, and a reasonable likelihood of success on the merits by a preponderance of the evidence. *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 500 (7th Cir. 2008). The

second element, irreparable harm, "is evaluated on a sliding scale," meaning the "better the Director's case is on the merits, the less its burden to prove that the harm in delay would be irreparable, and vice versa." *Id.* (quoting *Francisco Foods*, 276 F.3d at 286–87).

For the reasons outlined below, I find that the Director has satisfied each criterion supporting injunctive relief.

**B.      The Director's Reasonable Likelihood of Prevailing on the Merits**

I begin with the element most directly implicated by the ALJ's decision: whether the Director can demonstrate the Board's reasonable likelihood of success on the merits in the underlying administrative action. A reasonable likelihood of success means a "better than negligible chance of prevailing," or "'some chance of succeeding on the merits." *Electro-Voice*, 83 F.3d at 1568; *see also Hadsall v. ADT, LLC*, No. 21-cv-9-JDP, 2021 WL 2283884, at *3 (W.D. Wisc. June 4, 2021) (holding plaintiff in preliminary injunction case must show "some likelihood of success on the merits, not merely a better than negligible chance") (citing *Mays v. Dart*, 974 F.3d 810, 821 (7th Cir. 2020)).

In this proceeding, I lack the authority to rule on the merits of the pending Board action. *Electro-Voice*, 83 F.3d at 1567 (citation omitted); *Francisco Foods*, 276 F.3d at 287 ("The court's inquiry is confined to the *probability* that the Director will prevail."). However, in order to evaluate the "probability of success before the Board," I must scrutinize whether there is sufficient evidence supporting the claims under applicable law. *See Irving Ready-Mix, Inc.*, 653 F.3d at 570. Considering "the Board's expertise in matters of labor relations," I am "hospitable to the [Board's] view of the law" in making

this determination. *Francisco Foods* 276 F.3d at 287; *NLRB v. Irving Ready-Mix, Inc.*, 780 F. Supp. 2d 747, 751 n.1 (N.D. Ind.), *aff'd* 653 F.3d 566 (7th Cir. 2011).

The ALJ's decision is highly instructive on the Director's reasonable likelihood of success. The parties had the opportunity to submit all evidence relevant to the merits of the unfair labor practices charges at a four-day administrative hearing before ALJ Steckler. After taking in the evidence, the ALJ issued an eighty-seven-page decision on the merits of the charges. [DE 33-1.] The ALJ weighed competing evidence, rendered credibility determinations to resolve conflicting testimony, and by-in-large found List to have committed the alleged unfair labor practices. *Id.* at 72–73.

As previously explained, Section 10(j) involves a "predictive" exercise that hinges on "what the Board is likely to do with the case." *Franciso Foods*, 276 F.3d at 288. Where, as here, the administrative record is robust and the court determines that no additional testimony is needed to evaluate whether injunctive relief is "just and proper," the Director is entitled to "a favorable construction of the evidence, much as . . . if he were a plaintiff appealing the grant of summary judgment in favor of the defendant." *Id.* at 287 & n.9. While the ALJ's decision is not binding on my determination of the Director's reasonable likelihood of success, I am not entitled to make credibility determinations and must give the ALJ decision "appropriate deference." *Francisco Foods*, 276 F.3d at 287–88; *Ohr v. MTIL, Inc.*, No. 17 C 2656, 2017 WL 5444009, at *2 (N.D. Ill. Nov. 14, 2017) ("[C]redibility determinations are the

exclusive province of [the Board], acting through the ALJ, who heard the testimony and observed the witnesses."); *see, e.g., Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 335, 337–38 (2d Cir. 1999) (court erred by rejecting ALJ credibility assessments and factual inferences where administrative record "contained conflicting testimony on virtually all of the key issues" which "could be resolved only on the basis of assessments of the credibility of the various witnesses," the "ALJ supported his credibility assessments" with evidence and logical inferences to be drawn from the record, and court received "no new evidence" on relevant facts in dispute).

Even more importantly, where, as in this case, there are many facts in dispute and the ALJ has already assessed the credibility of competing evidence, the ALJ's preliminary decision on the merits is critical to my predictive analysis for two reasons. First, on direct appeal, the Board will afford deferential treatment to the ALJ's credibility determinations, unless a clear preponderance of the evidence convinces the Board that the ALJ was wrong. *Irving Ready-Mix, Inc.*, 780 F. Supp. 2d at 751 n.1. *See generally Standard Dry Wall Prods.*, 91 NLRB 544 (1950), *enfd.* 188 F.2d 362 (3d Cir. 1951). Second, once the administrative record is closed (as in this case), the Board will refrain from considering any other evidence on appeal. *See, e.g., Innovating Commc'ns Corp.*, 333 NLRB 665, 665 n.2 (2001) (declining to consider documents entered in 10(j) proceeding that were not made part of the administrative record).

In sum, making a prediction of what will ultimately happen in this case strikes me as rather straight-forward exercise. This is because, let's not beat around the bush,

34

the ALJ's opinion in this case is such a resounding win for the Director as to be a slam dunk. On nearly every issue, the ALJ shot down nearly every argument made by List. Most importantly, time and time again, whenever a credibility decision had to be made, the ALJ sided with the employees' story, and discredited List's. In the appeal to the Board, List will therefore be facing a nearly insurmountable burden of showing that the ALJ's credibility findings were flawed. To call that a steep hill to climb doesn't quite capture the elevation; it's more like stroll up Mt. Everest.

  **1.  Violations of Section 8(a)(1) of the Act**

  Section 8(a)(1) of the NLRA prohibits employers from interfering with, restraining, or coercing employees in their exercise of rights—such as self-organization, forming, joining, or assisting labor organizations, and collective bargaining—protected under Section 7 of the Act. 29 U.S.C. § 158(a)(1). Section 7 of the Act guarantees both the right to engage in concerted activities for purposes of collective bargaining as well as the right "to refrain from any or all such activities." *Id.* § 157. The Director alleges a spate of actions by List in the run-up to the election interfered with, restrained, or coerced employees' ability to exercise rights protected under the Act. I will address each in turn.

  Initially, the Director has "some chance" of prevailing on the merits of his claim that List violated Section 8(a)(1) by creating the impression that Avelar's organizing activities were under surveillance. The NLRA protects employees' right to engage in

35

organizing activities "without the fear of surveillance." *FlexSteel Indus.*, 311 NLRB 257, 257 (1993). An employer creates an unlawful impression of surveillance by making statements from which, "under all of the relevant circumstances, reasonable employees would assume . . . that union or protected activities had been placed under surveillance." *McClain & Co.*, 358 NLRB 1070, 1070–73 (2012); *see also Classic Sofa, Inc.*, 346 NLRB 219, 221 (2006). This is an objective test of the tendency of a statement to interfere with free exercise of activities protected by the Act, rather than a subjective inquiry about the motive for the statements or the employees' reaction to the statements. *Miller Elec. Pump & Plumbing*, 334 NLRB 824, 824–25 (2001). When an employer tells an employee that it is aware of union efforts without providing a lawful source of the information, the employee may reasonably conclude that the employer is monitoring protected activities. *Sam's Club*, 342 NLRB 620, 620–21 (2004); *FlexSteel Indus.*, 311 NLRB at 257–58.

Lieberman accused Avelar of leading the organizing effort. At the time he was not an open supporter of the Union; when questioned, he denied involvement. And Lieberman refused to provide the source of the information, simply alluding to rumors around the facility that he had been "harassing" other employees. This supposed harassment amounted to protected organizing activities: discussing the possibility of unionizing, signing authorization cards, and attending Union meetings. [*See* Tr. at 959–61; 1095–96.] As List points out, there is some evidence that Avelar was aware that another List employee had provided information about his protected activities to

Lieberman: he told the Union President, Jackson, that someone "from our group" had "narced" on him to Lieberman and figured that "someone pretty much ratted [him] out." [DE 7-5 at 29; Tr. at 232–33.] But this argument ultimately boils down to conflicting witness testimony. The only indication that Avelar knew the true source of Lieberman's information regarding his protected activities, and was not merely speculating about the source, appears in Lieberman's discredited testimony. [*See* DE 33 at 12–13.] I find no reason to credit Lieberman's account over Avelar's. In the credited account, she told Avelar directly, "I know it was you," asking employees to sign authorization cards and attend Union meetings but did not identify the source of the information. I therefore find that the Director has some chance of showing that a reasonable person in Avelar's shoes would assume Lieberman's statements meant that his protected activities were under surveillance, in violation of Section 8(a)(1).

Similarly, the Director has at least some chance of showing that Lieberman's June 8 statements impliedly threatening Avelar with termination violated Section 8(a)(1). Employers can communicate with employees during a union campaign but may not make statements including any "threat of reprisal or force or a promise of benefit." *Gissel Packing Co.*, 395 U.S. at 617–18; *see, e.g.*, *Am. Tool & Engineering Co., Inc.*, 257 NLRB 608, 608–11 (1981) (employer references to employees' probationary status in connection with protected union activities constituted unlawful threats in violation of Section 8(a)(1)). To tell the difference between lawful employer communications and unlawful

threats or promises of benefits, we ask whether, under the circumstances, a statement could reasonably be construed as coercive from the employee's perspective. *Double D Constr. Grp.*, 339 NLRB 303 (2003); *Smithers Tire & Auto. Testing of Tex., Inc.*, 308 NLRB 72 (1992); *see also Gainseville Mfg. Co.*, 271 NLRB 1186, 1188 (1984) ("It is the tendency of . . . conduct to be coercive which determines the violation and not the actual effect."). Statements about predicted job losses in connection with unionization activities, without further explanation, can be reasonably construed as coercive. *See, e.g., Larson Tool & Stamping Co.*, 296 NLRB 895 (1989). Thus, for example, an employer may provide truthful information to employees about potential replacement if a union goes on strike — but may not, without further explanation, make specific references to employees losing their jobs in connection with protected activities. *Eagle Comtronics, Inc.*, 263 NLRB 515, 515–16 (1982).

Here, Avelar's credited account of his conversation with Lieberman included a statement that a reasonable employee could have taken as a threat of termination in connection with suspected organizing activities. After Avelar asked if Lieberman knew that she was not allowed to interrogate employees about organizing activities during a union campaign, Lieberman said, "I can fire you right now if I wanted to. You don't have your 90 days in." [Tr. at 138.] List's response points to tension in the evidence, arguing that Avelar could not have reasonably believed that his employment was implicitly threatened. [DE 26 at 29.] According to Lieberman, Avelar brought up the topic of termination—she says he "randomly" brought it up—and told him that she was

38

aware she could not "fire someone for being involved." [Tr. at 953–54.] In the same breath, she noted, "There is a company policy, though," apparently in order to make clear to Avelar "that in the first 90 days of employment, employees are on probation, and that they could be terminated." *Id.*

Even if I accepted Lieberman's version of events, List's preferred interpretation is questionable. Lieberman's statement that she knew that she could not terminate an employee for union involvement indicates that she was aware of the unlawful nature of such conduct; but it is not dispositive of whether a reasonable employee in Avelar's position could have taken her statement to indicate that she would take such action in his case. Context is critical in this regard. Lieberman may have simply been waxing on the technical distinction between List's ability to terminate an employee for *non-union* activity during a probationary period and its inability to terminate an employee for union-related activity. But, in context, the timing of this statement is suspect. Her statement about termination in the probationary period was made immediately after she questioned Avelar about his suspected union activities. After the interaction, Avelar reacted to the statement: he said that Lieberman "threatened me with my job," and asked Jackson to expedite filing the election petition. [DE 7-5 at 29.] Considering the ALJ's reasonable resolution of the conflicting witness testimony, I find no reason to discredit Avelar's account of the conversation. [DE 33-1 at 12–13.] Thus, I conclude the Director has some chance of showing that Lieberman's June 8 statements to Avelar

constitute an unlawful threat of termination.

Next, the Director claims that Mr. List's June 11 speech to employees violated Section 8(a)(1) in two ways: by making statements of futility and threatening employees with termination for protected activities. In both cases, I find the Director has established a reasonable likelihood of success on the merits.

As previously noted, employers can communicate with employees about the pros and cons of a union in the midst of an organizing campaign "absent threats or promise of benefit." *Winkle Bus Co., Inc.*, 347 NLRB 1203, 1205 (2006). An employer's "words of disparagement" about a union generally do not violate Section 8(a)(1). *Id.* At the same time, statements that imply voting for a union is futile, such as telling an employee that a company has "never been [unionized] and never will be," or that a union "cannot get anybody anything [because the] only thing the employees can get is what the company is willing to give," constitute unlawful threats proscribed under Section 8(a)(1). *See, e.g.*, *NLRB v. Dorothy Shamrock Coal Co.*, 833 F.2d 1263, 1266 (7th Cir. 1987), *enfg.* 279 NLRB 1298 (1986); *Smithfield Foods, Inc.*, 347 NLRB 1225, 1229–30 (2006); *see also Maxi City Deli*, 282 NLRB 742, 745 (1987) (employer's comment that "there would never be a union at his restaurant" found unlawful).

Again, context is key to determining whether an employer's statement rises to the level of an unlawful threat or promise of benefit, as none other than Judge Learned Hand once explained:

Language may serve to enlighten a hearer, though it also

40

betrays the speaker's feelings and desires; but the light it sheds will be in some degree clouded, if the hearer is in his power. Arguments by an employer directed to his employees have such an ambivalent character; they are legitimate enough as such, and pro tonto the privilege of 'free speech' protects them; but, so far as they also disclose his wishes, as they generally do, they have a force independent of persuasion. The Board is vested with power to measure these two factors against each other . . . . *Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used, of which the relation between the speaker and the hearer is perhaps the most important part.* What to an outsider will be no more than the vigorous presentation of a conviction, to an employee may be the manifestation of a determination which it is not safe to thwart.

*NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941) (emphasis added).

List correctly notes that mere disparagement does not satisfy the Director's burden. [DE 26 at 30.] Mr. List certainly disparaged the Teamsters [*see, e.g.*, DE 7-6 at 16], but that is beside the point. The issue is whether his statements—made during a visit to the warehouse floor just three days after the Union filed a representation petition and Lieberman intervened in Avelar's organizing activities—went beyond mere disparagement to coerce or interfere with employees' Section 7 rights. The relevant context here not only included the unprecedented nature of Mr. List's remarks to the facility's staff, but List's ominous warning that followed the meeting, which suggested that employees stood to lose key benefits if the Union came in. [*See* DE 7-2 at 89–91.] The surrounding circumstances, including the questionable timing of the

meeting, thus support the inference that Mr. List's June 11 remarks could be reasonably construed as threatening employees for supporting the Union.

What's more, the ALJ credited testimony that attributed to Mr. List statements suggesting that List had never been a union company, would do anything necessary to prevent unionization ("god forbid"), and that in the event of certification, the company would "not negotiate with thugs" like the Teamsters. [*See* Tr. at 296; DE 7-6 at 20.] These statements go beyond merely informing employees of the potential drawbacks of unionization if List reached an impasse in negotiations: they are tantamount to saying that employees are on a fool's errand, preordained to fail. Here, again, the parties' arguments hinge on close factual inferences and credibility determinations. [*See* DE 7 at 17; DE 26 at 30; DE 28 at 10.] I think it is highly unlikely that the Board will disagree with the persuasive credibility assessments of the ALJ, and for present purposes I find no compelling basis to depart from them. [*See* 33-1 at 17–18.]

The Director also claims that Mr. List's June 11 speech included an unlawful threat of termination for union activities. This claim centers on Mr. List's statements about what might happen if the Union elected to go on strike because of an impasse in collective bargaining negotiations. During an organizing campaign, employers can provide an accurate picture of employee rights in the event of an economic strike, including the possibility that employees will be permanently replaced. *See Eagle Comtronics*, 263 NLRB at 515. The employer need not provide a full accounting of protections available to employees who are replaced during a strike. *Id.* at 516.

42

However, an employer's statements about permanent job losses in the event of a strike can still violate Section 8(a)(1) if they can be "fairly understood as a threat of reprisal against employees" or are "explicitly coupled with such threats." *Id.* at 515–16; *accord Gainseville Mfg. Co.*, 271 NLRB at 1188. Messages conveying specific references about job losses are "generally deemed to be unlawful" under this standard because "they convey to employees the message that their employment will be terminated." *Connecticut Humane Soc'y*, 358 NLRB 187, 220 (2012).

In fairness, the evidence supporting this claim does not paint a portrait of clarity. Mr. List's written remarks include no statement that crosses the line elucidated in *Eagle Comtronics* [*see* DE 7-6 at 12–29], and one of the Board's credited witnesses testified that Mr. List merely raised the "possibility" of workers being replaced (and as a result not being immediately reinstated) in the event of a strike [Tr. at 423]. That said, ALJ Steckler separately credited testimony from Avelar and Perez that Mr. List said, "[I]f it went to a strike, [employees] wouldn't have a job [at List]," and "in a deadlock, the union would leave you out to hang dry, and if you're out to hang dry, you would not have a . . . job with his company." [Tr. at 155, 244–45.] While I acknowledge that Mr. List denied this statement was ever made, *id.* at 796, again, I find it imprudent to second-guess ALJ Steckler's credibility assessments, which are clearly articulated and based on record evidence and reasonable logical inferences. *See, e.g.*, *Silverman*, 196 F.3d at 335, 337–38. In light of the credited witness testimony, I conclude that the Director has some chance

43

of prevailing on his claim that Mr. List's June 11 statements constituted unlawful threats of termination, in violation of Section 8(a)(1).

The Director also has some chance of prevailing on the theory that DeTombeur's weird setup in the Munster facility constitutes unlawful surveillance under the Act. This claim requires demonstrating that DeTombeur's presence and alleged monitoring of employees on the warehouse floor was unduly coercive, which requires a showing that it was "out of the ordinary." *See CP Anchorage Hotel 2, LLC d/b/a Hilton Anchorage*, 370 NLRB No. 83 (2021); *Sage Dining Servs., Inc.*, 312 NLRB 845, 856 (1993). DeTombeur's observation of employees from a desk on the warehouse floor lasted several weeks in the critical period during which employees would decide whether to certify the Union, and he had never previously worked on the shop floor. He testified that he selected the location because it afforded a view of almost all employees in the warehouse, where organizing activities had been taking place, and ALJ Steckler credited his testimony that he arrived in Munster due to employees' "organizing activity." [Tr. at 928.] List points to testimony, which ALJ Steckler discredited, indicating that management would appear on the warehouse floor and DeTombeur had independent reasons for visiting the Munster facility, unrelated to union activities. [Tr. at 322, 867–69, 915, 928.] Nevertheless, considering the credited evidence and independently weighing the competing testimony, I conclude that there is a reasonable basis to conclude the Director has met his burden to show "some chance" of prevailing on the claim. Under the circumstances, DeTombeur monitoring employees' activities visually and via

44

cameras on the shop floor could reasonably constitute unlawful surveillance.

All of which brings us to the Director's final unlawful interference claim: that Mr. List's subsequent remarks on June 15, in which he made various statements about employee pay raises, constitute an improper offer of benefits. Employers may not time the announcement of benefits "to discourage union support," and the Board considers "the timing of the benefit announcement to determine its lawfulness." *In re Mercy Hosp.*, 338 NLRB 545, 545 (2002). There is a rebuttable presumption that an employer's announcement or grant of benefits during the run-up to a certification election is coercive. *Id.* Announcing wage increases or benefits during an election campaign is "not per se unlawful where the employer can show that its actions were governed by factors other than the pending election," which requires a showing that "the benefits granted were part of an already established company policy and the employer did not deviate from that policy upon the advent of the Union." *Id.* (quoting *Am. Sunroof Corp.*, 248 NLRB 748 (1980)).

The Director has made a substantial showing on the charge that Mr. List's June 15 statements constitute an improper offer of benefits under this standard. For starters, it is important to remember that Mr. List's remarks to employees, prior to June 11, were unprecedented. They were also made in the critical period ahead of the representation election. They followed employee discussions about unionization focused on improving wages, benefits, and working conditions, which ultimately led to the Union filing a

certification petition. I thus find that the timing of List's announcement supports the reasonable inference that the announcement was tied to voting down the Union.

Moreover, the credited account of Mr. List's speech included direct references to the Union: that it was "not good" for employees and that the employees could still get their authorization cards back. While List denies these statements and argues that the Director cannot show that any of Mr. List's statements were "linked to Union rejection," [DE 26 at 13], List's contrary testimony was not credited and is not otherwise supported in the documentary record. List's discredited testimony also conflicted with testimony from multiple employees that they had not previously heard about wage increases when they went back into effect in March. On balance, the Director meets his burden to show a likelihood of success on this charge.

### 2.    Violations of Section 8(a)(3) of the Act

Under Section 8(a)(3) of the NLRA, employers may not discriminate in regard to the hiring, tenure of employment, or term or condition of employment "to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). The Director can demonstrate a violation of Section 8(a)(3) by proving three elements: (1) employees engaged in Section 7 activity; (2) List knew of the activity; and (3) List had animus toward the activity. *Wright Line*, 251 NLRB 1083 (1980). The final element requires a showing sufficient to establish "that a causal relationship exists between the employee's protected activity and the employer's adverse action against the employee." *Tschiggfrie Props., Ltd.*, 368 NLRB No. 120 at 1, 8–9 (2019). The Director asserts three Section 8(a)(3)

violations, which I address in turn.

    *First,* the Director charges that List unlawfully discriminated in the terms of employment to discourage membership in the Union by modifying its enforcement of its cell phone policy a few days after the Union filed its representation petition. List was aware of employees' organizing activities when Lieberman made her June 14 announcement regarding enforcement of the policy prohibiting use of cell phones and headphones on the work floor, and employees were engaged in protected organizing activities at the time Lieberman made the announcement. Therefore, the question is whether there is sufficient evidence of List's animus — that heightened enforcement was linked to the organizing campaign. *See Green Apple Supermarket of Jamaica, Inc.*, 366 NLRB No. 124 (2018). I find that there is sufficient evidence of List's animus in connection with the June 14 announcement to establish "some chance" of the Director's success on the merits.

    List cites evidence suggesting that Lieberman's June 14 "reminder" was due to employees' increased cell phone use on the warehouse floor in the weeks preceding the announcement. [DE 26 at 31.] The record reflects that prior to June 14, Lieberman would remind employees about the cell phone policy; government witnesses testified that Lieberman would tell employees on a weekly basis that they should not be on their phones while working on the shop floor. [Tr. at 463, 475.] But ALJ Steckler discredited Lieberman's testimony concerning prior enforcement of the policy, as she found that

Lieberman's testimony about when the violations had worsened and how often Lieberman reprimanded employees were inconsistent and did not stand up on cross-examination. [DE 33-1 at 28; *see also* Tr. at 990–92, 1054–55.]

While I am not entirely convinced of the basis for the ALJ's assessment of Lieberman's credibility in this instance, I am confident that the Board could ultimately infer animus based on the circumstances surrounding Lieberman's announcement. The Director does not need to point to a 'smoking gun' where List's managers memorialized a desire to rachet up enforcement of the cell phone policy specifically due to ongoing Union activities. Indeed, if one were engaged in unfair labor practices, that would be quite a foolish move. The timing of the announcement and the way it was conveyed—as part of a series of captive-audience meetings immediately following the Union filing for an election—supports the conclusion that it was made in response to the organizing campaign. *See NLRB v. Rain–Ware, Inc.*, 732 F.2d 1349, 1354 (7th Cir. 1984) (holding, in context of employee discharge, that "[t]iming alone may suggest ant-union animus as a motivating factor in an employer's action").

The announcement came the same day that DeTombeur camped out on the work floor, in the immediate aftermath of numerous communications in which List discouraged employees from Union activities. While this "safety" policy was important enough to enforce rigorously after June 14, prior to that time only one employee had received a formal verbal warning under the policy. Adding to this is the fact that the employees had historically communicated about pro-Union activities via text messages,

48

and continued to do so after List gave its cell phone "reminder." [Tr. at 207, 210, 214–15, 341; DE 7-2 at 122–25.] In light of the ALJ's initial determinations and my independent assessment of the evidence, I find that the Director has a non-negligible chance of prevailing on the merits of this claim.

Second, the Director claims that DeTombeur's closer scrutiny of Munster facility employees also constitutes a violation of Section 8(a)(3). For substantially the same reasons I previously articulated concerning the Director's parallel claim under Section 8(a)(1), the Director meets his burden to show a reasonable likelihood of prevailing on this claim. As with the cell phone policy, the question here is whether List acted with animus toward protected organizing activities. While there is certainly evidence in the record supporting List's preferred inference, that DeTombeur was on the warehouse floor for a reasonable business reasons unrelated to the organizing campaign and he did nothing to intervene directly in employees' protected activities, see, e.g., Tr. at 322, 849–50, 867–69, 915, there is also ample evidence to the contrary. The fact that he had never done this before makes one look askance at his claim of benign motives. What's more, the timing of his action could not be any more suspicious. Finally, the ALJ again "discredited DeTombeur's claim" that he set up in the warehouse frequently. [DE 33-1 at 23.] In my view, once again, the weight of the evidence on this issue favors the Director, although to a lesser degree than on the other issues.

Finally, the Director asserts that List violated the NLRA by suspending and

terminating Avelar and Perez ahead of the representation election. To prevail on these claims under the Board's *Wright Line* analysis, the Director must show that: (1) Avelar and Perez were engaged in Section 7 activity; (2) List knew of the activity; and (3) List had animus against the activity, which must be shown through evidence sufficient to establish a causal relationship exists between the employee's protected activity and the employer's adverse action against the employee. *See General Motors*, 369 NLRB No. 127 at 6–7, 15 (2020*)*. Alternatively, where there is no dispute as to the employer's motive and an employee has been discharged for misconduct outside the scope of protected activity, it is appropriate to evaluate the discharge as a Section 8(a)(1) interference claim under *NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21, 23 (1964). Under *Burnup*, it is sufficient for the Director to prove that: (1) the employee was engaged in a protected activity; (2) the employer knew that the employee was engaged in such activity; (3) the basis of the discharge was an alleged act of misconduct in the course of that activity and (4) the employee was not, in fact, guilty of that misconduct. *Id.*

The Director bears the initial burden of proving by a preponderance of the evidence that adverse employment actions were motivated by a desire to undermine protected activity. *Chi. Tribune Co. v. NLRB*, 962 F.2d 712, 716 (7th Cir. 1992). The employer's motivation for adverse employment action is "critical." *Electro-Voice*, 83 F.3d at 1568; *NLRB v. So-White Freight Lines, Inc.*, 969 F.2d 401, 406 (7th Cir. 1992). Employer hostility toward organizing activities, the timing of an adverse employment action relative to such activities, and the employer's reliance on pretextual justifications for

adverse employment actions, and disparate treatment are evidence of employer animus in this context. *Electrolux Home Prods.*, 368 NLRB No. 34 (2019) (animus can be shown by both direct and circumstantial evidence); *see also Bannum Place of Saginaw, LLC*, 370 NLRB No. 117 (2021)*; Roemer Indus.*, 367 NLRB No. 133 (2019). If the Director carries his initial burden on animus, then the burden shifts to List to demonstrate by a preponderance of the evidence that it would have taken the same adverse employment actions for legitimate reasons even in the absence of "related" protected activity. *Lucky Cab Co.*, 360 NLRB 271, 275–76 (2014); *see also Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 936 (D.C. Cir. 2011) (characterizing rebuttal burden as "substantial"). However, pretextual justifications for adverse employment actions, such as false or irrelevant reasons for the decision to suspend or terminate an employee, fail to sustain List's burden on rebuttal. *Lucky Cab Co.*, 360 NLRB at 276; *see also Inter-Disciplinary Advantage, Inc.*, 349 NLRB 480, 509 (2007) (employer's "shifting explanation for a discharge" or "post hoc attempt to rationalize such a decision are suggestive of a pretext").

ALJ Steckler dedicated 36 single-spaced pages to analyzing the conflicting evidence relevant to Perez's and Avelar's suspensions and terminations. [DE 33-1 at 33–69.] She concluded that the Director proved his case on the merits. *See id.* For present purposes, List focuses on two of the elements the Director must establish before the Board: protected activity and animus. [DE 26 at 27–28.] On both fronts, List argues that the Director has little chance of meeting its burden, meaning there is a low likelihood of

success on the merits of the unlawful termination claims. While List highlights some close calls in sorting out the evidence, I am not persuaded that these issues are fatal to the Director's claims on the merits.

List first argues that the Director has little chance of meeting his burden to show that List wrongfully terminated Perez and Avelar because they were disciplined for purely personal activities that are not protected under Section 7. *Id.* Section 7 guarantees employees the "rights to self-organization, to form, join, or assist labor organizations," and the right to "engage in other concerted activities for the purpose of . . . other mutual aid or protection." 29 U.S.C. § 157. To be "concerted," activity must be "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself." *Meyers Indus.*, 281 NLRB 882, 884–85 (1986). For example, the Board has held that a terminated employee was not engaged in protected concerted activity when he complained about the condition of the road over which the employees had to drive to reach the employee parking lot, because there was no evidence that his "personal 'gripe'" was made "in concert with any other employee," nor that it "touched a matter of common concern." *Capitol Ornamental Concrete Specialties*, 248 NLRB 851, 851 (1980). At the same time, the Board has also recognized that communications between employees initiating, inducing, or preparing for group action, as well as individual employees raising group complaints to the attention of management, constitute concerted activities under the Act. *See, e.g., Fresh & Easy Neighborhood Mkt., Inc.*, 361 NLRB 151 (2014) (employee seeking coworkers' assistance in raising sexual harassment

complaint, while pursuing individual objective, was nevertheless engaged in concerted activity because action addressed a workplace concern); *Constellium Rolled Prods. Ravenswood, LLC v. NLRB*, 945 F.3d 546, 500 (D.C. Cir. 2019) (Board did not depart from precedent in finding that employee writing words "whore board" on the top of overtime sign-up sheets engaged in course of protected activity, because conduct was not so egregious as to lose protection under Act).

There is no dispute that after List's managers became aware that Avelar and Perez were organizing the facility, Perez sent a text message of a sexual nature to a private text thread in which employees who had signed Union authorization cards were coordinating organizing activities. [*See* Tr. at 340–41; DE 7-2 at 4, ¶¶ 12–13; DE 7-5 at 45–48.] To List's point, Perez testified that his text alluded to Lieberman's perceived romantic interest in Tyler Demps—Perez noted that Lieberman had called Demps "at all kinds of hours." [*See* Tr. at 340–41.] But that does not change the fact that Perez was responding to Avelar's message coordinating employees' responses to anti-union literature distributed by List's management. [DE 7-5 at 45.] In response to Avelar's request that the employees call out Lieberman's "anti-union propaganda," Perez sent the message to "everybody that . . . was for the union and signed a card." [*See id.* at 47; Tr. at 341.] Thus, in the context of the private, pro-Union text thread, Perez's off-the-clock text can be reasonably construed as an expression of support for Avelar's proposal to tell Lieberman not to send further anti-union messages to employees'

personal devices. [*See* Tr. at 209–11.] While Perez's message was uncouth, and there is some possibility that the Board will read it to fall beyond the scope of Section 7 [*see* DE 26 at 28], I am satisfied that the Director has established "some chance" of establishing that it constitutes protected activity.

Similarly, there is sufficient evidence from which the Board could reasonably determine that Avelar's conduct was protected under Section 7. He was suspended and terminated after allegedly telling Xavier Oquendo that he had "filed for a permit to [*sic*] freedom of speech in Crown Point so that I can protest and expose people who are anti-union." [DE 7-2 at 111–12.] Taking this account on its face, List believed that Avelar was planning to protest in Crown Point, Lieberman's hometown, to make her "suicidal" and "expose people who are anti-union." *Id.* From one angle, this statement suggests that Avelar was acting on his independent initiative, and thus was not engaged in "concerted" activity protected under Section 7.

However, that view ignores substantial evidence that employees were communicating about List's ongoing anti-union efforts. [*E.g.*, DE 7-5 at 45–48.] By the time Avelar allegedly made this statement on June 18, List had convened three captive meetings in response to the organizing campaign. List had also learned that employees texted about organizing activities, including a coordinated response to Lieberman inundating them with anti-union literature. In that vein, an adverse inference was entered against List in the administrative proceeding because List was aware that Avelar was discussing protesting with other employees, such as Oquendo, but never

investigated what Avelar said to other employees (or did not obtain any other employee statements on the topic). [*See* DE 33-1 at 61–64.] ALJ Steckler found that Oquendo's report to Lieberman about the planned protest itself reflected concerted activity because, assuming Avelar was sincere about obtaining a permit, he was therefore communicating about organizing activities. She further reasoned that List would have discovered additional information reflecting Avelar's activity was concerted if it had interviewed other employees about the planned protest, which List never did. *Id.* These findings are entitled to deference. There is, of course, some chance that the Board may conclude that this reading of the facts is so flawed that it must overrule the ALJ's decision. But that indeterminate possibility does not change the Director's burden here. Thus, I find that there is a sufficient basis to conclude that he has some chance of establishing that Avelar's activity was protected under the NLRA.

List further argues that the Director cannot meet his burden to show an unlawful motive for its alleged adverse employment actions because the actions were not motivated "solely on the basis of their union activities or sympathies." [DE 26 at 28 (citing *Electro-Voice*, 83 F.3d at 1568).] List relies on *Ohr v. MTIL, Inc.* for the position that "insubordinate, aggressive, and/or threatening behavior is a 'more than sufficient, non-union reason' to fire an employee" – implying that Perez and Avelar participated in similar conduct precluding a finding of animus. [*See* DE 26 at 28 & n.31 (citation omitted).]

In *Ohr*, an employee was allegedly "milling around" when a superior told him to get back to work. 2017 WL 5444009, at *8. In response, the employee went off the rails: he made intentionally taunting and provocative remarks to the supervisor, then irately entered the supervisor's office, interrupted a meeting, engaged in another aggressive verbal altercation, threatened and made hostile gestures toward coworkers, and refused to leave the premises. *Id.* at *5–*6. After departing the building, the employee got into another aggressive verbal altercation with coworkers in the parking lot. *Id.* at *6. Afterwards, he signed a written report stating that he was insubordinate when told to stop talking to other employees and return to work, approached his supervisor in a threatening manner, and threatened another co-worker. *Id.* The court in *Ohr* held that this "exceedingly insubordinate, aggressive and threatening behavior toward another worker and toward one of MTIL's managers" supported the conclusion that the employer had a "sufficient, non-union reason" to terminate the employee. *Id.* (citing *Electro-Voice*, 83 F.3d at 1570 & n.17). This physically "aggressive and confrontational" behavior bears little resemblance to the circumstances at issue in the current dispute. *See id.* at *9.

In *Electro-Voice* (on which *Ohr* bases its analysis), the Seventh Circuit concluded that the timing of discharges and the manner in which several terminations were carried out suggested the NLRB had a better than negligible chance of success on the merits of the claims. 83 F.3d at 1570. At the same time, the court determined that circumstances surrounding one employee's termination "sufficiently distinct to warrant

separate consideration," holding that there was insufficient evidence of the employer's animus. *Id.* at n.17. As in *Ohr*, the employee's conduct was egregious and had no reasonable connection to organizing activities: there was "evidence that [the employee] destroyed several thousand dollars worth of equipment," fought with a co-worker, and missed work twice — all in the span of eight weeks. *Id.*; *see also id.* at n.12.

Based on these authorities, I have significant doubts whether List can show a "more than sufficient, non-union" reason for the unlawful suspensions and terminations. In light of my factual findings, I conclude that the Director has established a reasonable likelihood of establishing that List took adverse employment actions against Avelar and Perez because of animus toward unionization.

Avelar was suspended and terminated over an allegedly "threatening" statement about setting up a protest in a town of over 30,000 people, apparently for the purpose of calling out "anti-union" people. According to List, he rudely joked that he was getting a permit for a site that was 10 minutes away from Lieberman's home, which would make Lieberman "suicidal." He allegedly made the statement to another employee (not Lieberman) during work hours, in the midst of an organizing campaign in which Lieberman had been disseminating a variety of anti-union statements. The context here also includes separate threats of termination Lieberman allegedly made to Avelar in connection with his protected organizing activities prior to the Union's representation petition. List was aware of Avelar's role in the organizing campaign, as reflected in his

prior run-in with Lieberman over the Union and Jackson's letter identifying Avelar as a member of the Union's Organizing Committee. [DE 7-5 at 42.] Notably, Avelar denies having ever made the statements—his denial was corroborated by Leggs—and the employee who reported the conversation to Lieberman changed his account.

This all suggests that the factual basis for his swift suspension and termination was suspect. What's more (and once again), the ALJ expressed serious doubts about the credibility of List's witnesses concerning its investigation into both Avelar's reported statement and List's supposed concern for Lieberman's security. [*See* DE 33-1 at 61–63, 65.] Finally, the comparator evidence available suggests that Avelar's alleged statement typically would not result in discharge. [*See* DE 7-2 at 135–44.]

As for Perez, he was terminated for "inappropriate text messages (of sexual nature)," after being told he was suspended for sexual harassment. He admittedly sent an off-hours text message to a private, pro-union text group, in response to a proposed coordinated response to anti-union literature sent by Lieberman to the employees' personal devices. The message was shared with Lieberman after the fact and she found it offensive. DeTombeur forwarded the texts to Mr. List and Bello immediately after Lieberman shared the messages, noting he was "[n]ot sure if there is anything there that constitutes sexual harassment." [DE 7-2 at 122.] Bello later noted that Perez was "one of the ring leaders" of the ongoing organizing activity. *See id.* at 120. Perez, who had an unblemished disciplinary record and was one of the longest-tenured warehouse employees at the Munster facility, was sacked for a single infraction shortly after being

58

identified by the Union as a member its Organizing Committee. [*See* DE 7-5 at 42.]

Perez's treatment contrasts sharply with List's handling of a comparable employee, who in the course of a pattern of harassing comments on a female coworker on the shop floor, stated that he wanted to see her wear "Daisy Duke" shorts to work and watch her bend over. [DE 7-2 at 135–42; Tr. at 551–55.] While in that case the employee was not terminated after List gave him the opportunity to apologize, here, the record reflects that DeTombeur hardly gave Perez a chance to explain himself and did not offer Perez a chance to apologize to Lieberman for the text. The notion that Perez's harassment was "factually distinct from" this comparator's misconduct, and therefore List should be allowed to "treat these forms of misconduct differently without violating the Act" [DE 26 at 28 n.32], borders on the absurd. Here, as with Avelar, the ALJ found List's witnesses less than credible, finding the reasons for Perez's suspension and termination shifted and the investigation appeared one-sided. [DE 33-1 at 34–38, 50–51.]

In a nutshell, the timing of List's actions was suspect, the investigation of both situations appears to have been rushed (or at least improperly one-sided), and List offered shifting reasons for the suspensions and terminations. There is substantial evidence supporting a finding that List suspended and fired these Union adherents because of their protected activities, rather than a "sufficient, non-union" reason. In short, I am satisfied that the Director has some chance of establishing List's animus in

connection with the unlawful terminations of Avelar and Perez. The Director is reasonably likely to prevail on these claims.

### 3.    *Gissel* **Bargaining Order**

In light of my factual findings and the ALJ's decision and recommended order [DE 33-1], I conclude that the Director is reasonably likely to establish that a bargaining order is an appropriate remedy for List's alleged unfair labor practices. The conduct at issue in this case is so serious and substantial that the possibility of erasing its effects and conducting a fair election through the Board's traditional remedies is simply unrealistic. *See Gissel Packing Co.*, 395 U.S. at 596–97, 614–15. Further, having expressed a clear sentiment regarding representation through signed authorization cards, I find that the Director is reasonably likely to establish that List's employees would be better protected against the alleged unfair labor practices through the issuance of a bargaining order than by the Board's traditional remedies alone. *See id.*

I have some concern that issuing the requested relief risks requiring new employees to work with the Union. I have no interest in foisting a union on folks who prefer to go it alone. Yet, the core of this case is about how, in just a few weeks, the Union went from enjoying nearly 70% employee support to getting trounced in the election. The anti-union gong is hard to un-ring, particularly when bashed so aggressively. Although "secret elections are generally the most satisfactory," or "preferred method," to determine if most employees support a union, *Gissel*, 395 U.S. at 602, in appropriate circumstances an interim bargaining order is necessary due to the

passage of time and the abusive tactics at issues, *see, e.g., Electro-Voice*, 83 F.3d at 1575.

The Director has a persuasive case that List's unfair labor practices dramatically shifted support away from the Union by cultivating a culture of fear among List's employees. In short, the result of the election last summer was predictable: a "great exodus" of Union support. *Contra Red Oaks Nursing Home, Inc. v. NLRB*, 633 F.2d 503, 510 (7th Cir. 1980) (declining to enforce bargaining order, and noting "there was little change in the number of employees who signed authorization cards, . . . and those who voted in favor of the union"). What's worse: these tactics are likely to permanently erode support for the Union moving forward, in the absence of an order requiring List to engage with the Union as bargaining representative. The conduct alleged includes a variety of "hallmark" labor law violations, including threats, promises of benefits, discriminatory discharges, surveillance, and changing work conditions, all undertaken by List's senior managers — the same people who run the operation today. These are the type of unfair labor practices that courts have routinely found require bargaining orders to return the parties to the *status quo. See Electro-Voice*, 83 F.3d at 1570–72; *NLRB v. Gerig's Dump Trucking, Inc.*, 137 F.3d 936, 943–44 (7th Cir. 1998); *Ohr*, 2017 WL 5444009 at *12 (collecting cases).

I acknowledge that List's workforce has changed in the time since the Director filed his Petition. [DE 26 at 24–25.] But employee turnover alone does not obviate the need for a bargaining order under the circumstances. The Seventh Circuit has enforced

bargaining orders even where only 20% of the original workforce was still intact. *See, e.g.*, *NLRB v. Intersweet, Inc.*, 125 F.3d 1064, 1070 (7th Cir. 1997) (underscoring severity of employer's actions and "continuity in management"); *NLRB v. Gerig's Dump Trucking, Inc.*, 137 F.3d at 943–44 (enforcing *Gissel* order where only five employees remained at company from unit of twenty-one employees). Further, while there plainly has been some turnover, it is not clear how much List's workforce has changed. [*See* DE 26-1; DE 28 at n.6, n.7.] Finally, equally important is the level of turnover in *List's management*, which remains unchanged. *See, e.g.*, *Montgomery Ward & Co, Inc. v. NLRB*, 904 F.2d 1156, 1157 (7th Cir. 1990) (noting that 12 of 13 managers involved in alleged unfair labor practices were no longer employed and denying to enforce Board order). I find that this fact substantially supports the need for an interim bargaining order notwithstanding employee turnover. *See Gerig's Dump Trucking, Inc.*, 137 F.3d at 943–44.

## C.   Balance of Harms and Adequacy of Remedy at Law

The Director's likelihood of success on the merits dovetails with the next factor I must consider under Section 10(j): whether irreparable harm to List's employees will ensue in the absence of interim relief, and whether that potential harm outweighs potential harm to List as an employer. Irreparable harm is evaluated on a sliding scale: "a strong showing as to the Director's likelihood of success will permit a weaker showing as to the balance of harms posed by the grant or denial of interim injunctive relief." *Francisco Foods*, 276 F.3d at 286 (citing *Electro-Voice*, 83 F.3d at 1568). Moreover, in "appropriate circumstances, the same evidence that establishes the Director's

likelihood of proving a violation of the NLRA may provide evidentiary support for a finding of irreparable harm." *Harrell*, 714 F.3d at 557 (quoting *Francisco Foods*, 276 F.3d at 297–98). In that vein, the Seventh Circuit does not "require specific proof of a causal relationship between employer violations and Union injuries." *Id.* Courts can infer the prospect of an irreparable injury from "the nature of the violation of the Act." *Id.* (construing *Francisco Foods*, 276 F.3d at 297). The Director has presented compelling evidence that List's anti-union effort had a chilling effect on employees' protected organizing activities. Based on the strong opinion issued by the ALJ, including devastating credibility findings, even if the Director makes only a weak showing in the balance of harms analysis, that will suffice.

The fact "that employees will be irreparably deprived of union representation" kicked in shortly after List sent Avelar and Perez packing. *Electro-Voice*, 83 F.3d at 1573. The Union held a card majority by June 9, but after List's alleged conduct, only 15 employees even voted, including Avelar and Perez as challenge ballots. The Union lost handily. In the absence of the Director's requested relief, this "precipitous decline in Union participation" is likely to worsen over time, undermining any chance of the Union reestablishing the majority it enjoyed prior to List's alleged unfair labor practices. *See Spurlino Materials, LLC*, 546 F.3d at 501. It is well established that "[t]he longer that an employer is able to chill union participation or avoid bargaining with a union, the less likely it is that the union will be able to organize and to represent

employees effectively" by the time the Board enters a final order, and this "risk is particularly true in cases involving fledgling unions, where the passage of time is especially critical." *Id.* at 500–01; *see also Electro-Voice*, 83 F.3d at 1573; *cf. Francisco Foods*, 276 F.3d at 298–99 (noting "well-recognized" harms to union and its members where union has "no formal and established bargaining relationship" with employer). Thus, I find that there is a high risk that List's alleged practices, if allowed to continue, will cause irreparable harm to the Union before the Board can intervene.

List argues that the Director's dilatory process contradicts a finding of harm. Further, List argues it will suffer inequitable harm as a result of an order requiring List to (i) reinstate Avelar and Perez, and (ii) recognize and bargain with the Union. I find that the threatened harm in this case outweighs any harm to List as an employer.

Initially, List asserts that the Director's "delay" in bringing his Petition shows that any harm at issue is "neither urgent nor exclusive to administrative delay," undermining the notion that it is "irreparable." [DE 26 at 21.] As detailed in my factual findings, the Director appears to have acted with all dispatch to investigate and initiate the administrative process against List. The charges were filed and amended between June 8 and August 23, during which time the Director investigated the unfair labor practice charges and the Union filed separate election objections. The election and unfair labor practices claims were consolidated in mid-September, after which the Director issued an amended consolidated complaint against List on October 8. Just a few weeks later, the parties appeared at a four-day hearing before Judge Steckler. List

obtained an extension on post-hearing briefs. After those were filed, the Director took

merely two business days to file his Petition and motion to try the injunction on the

administrative record.

The Board's work investigating a variety of charges in four months, trying them

on the merits, and then filing a Petition two business days after the ALJ proceedings

concluded cannot be fairly characterized as dilatory. The scope of the administrative

record reflects the detailed factual investigation the Board had to undertake to proceed

on the charges. Moreover, I am persuaded that in similar circumstances, courts in the

Seventh Circuit have found injunctive relief proper. *See Electro-Voice*, 83 F.3d at 1566

(ordering injunctive relief nineteen months after administrative complaint); *Nelson v.

Advocate*, 273 F. Supp. 3d 919, 927–29 (N.D. Ill. 2017) (ordering injunction where petition

was filed seven months after initial administrative charge).

I was told at the oral argument in this case that both Avelar and Perez were

ready, willing and able to come back to work at List if given the opportunity. But List

tells me that compelling reinstatement of both gentlemen would be a step too far. I

disagree. Based on my factual findings, I am not persuaded that this is a situation

involving such egregious activity on part of either employee to "justify rejection of the

reinstatement remedy." *Contra Precision Window Mfg., Inc. v. NLRB*, 963 F.2d 1105,

1107–08 (8th Cir. 1992). Reinstatement in this situation does not operate as a "sword,"

but rather a shield. *Contra id.* The circumstances surrounding both suspensions and

65

terminations were hurried and appeared to depart from List's past disciplinary practices. Both situations were also poorly documented and investigated. Rescinding discipline that the Director is reasonably likely to prove constituted a violation of federal labor law is unlikely to result in any harm to List. At the same time, List will retain full authority to impose lawful discipline on Avelar and Perez. Additionally, reinstatement will allow List to enjoying the benefits of two experienced employees (both in the industry and at the Munster facility), while limiting the accrual of any backpay owed when the Board enters its final order. In this situation, I find that the harm to List from reinstatement is low, and outweighed by the likely harm that will ensue in the absence of such relief.

The balance of harms and "adequate remedy at law" elements overlap considerably. For similar reasons, I find that Director has no adequate legal remedy at law. The "'adequate remedy at law' inquiry" focuses on "whether, in the absence of *immediate* relief, the harm flowing from the alleged violation cannot be prevented or fully rectified by the final Board order." *Harrell*, 714 F.3d at 557 (emphasis added) (citing *Spurlino Materials*, 546 F.3d at 500). While the Board possesses wide latitude in fashioning remedies for alleged unfair labor practices, *see* 29 U.S.C. § 160(c), the relevant inquiry is whether the Board's remedial authority—applied years after the alleged unfair labor practices—is adequate to "prevent[] or fully rectif[y]" the charged conduct. *Harrell*, 714 F.3d at 557.

List's conduct effectively arm-barred the Union from obtaining the formal certification required to bargain on behalf of its employees and drove out leading pro-Union employees in the process. As this initial 'nip in the bud' campaign fades into memory, it is unlikely the Union seed once planted will ever bloom: List's actions have the effect of reducing employees' ability to self-organize and bargain collectively even after the NLRB enters a final order on the merits. With the Union stymied in the interim, List's alleged unfair labor practices have the potential to be "enormously destructive" to its employees' organizational efforts. *Electro-Voice, Inc.*, 83 F.3d at 1575; *see also id.* at 1573 ("As time passes, the benefits of unionization are lost and the spark to organize is extinguished.").

### D.    Public Harm

Finally, I find that the requested relief is in the public interest. "The public interest is harmed when the Board's remedial powers under the NLRA lose their effectiveness with the passage of time." *Lineback v. Printpack, Inc.*, 979 F. Supp. 831, 847 (S.D. Ind. 1997). In this case, a temporary injunction will help "ensur[e] that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charges[s]." *See Electro-Voice*, 83 F.3d at 1574. Thus, the public interest favors granting temporary injunctive relief.

**Conclusion**

To preserve the issues for orderly determination as provided in the NLRA, pending the final disposition of the matters currently pending before the Board, I find that the Director's Petition for Temporary Injunction Under Section 10(j) of the National Labor Relations Act, as Amended [DE 1] is appropriate, just and proper. The Director's Petition [DE 1] is therefore **GRANTED.** The Director's motion to try the injunction based on the administrative record [DE 3] is **DENIED AS MOOT**. Finally, on April 21, 2022, the Director filed a Motion to Supplement the Record with the Administrative Law Judge's Decision. [DE 33; DE 33-1.] List does not object to its introduction into the record. [DE 38 at 1.] The Director's Motion [DE 33] is therefore **GRANTED**.

**ACCORDINGLY**:

To preserve the issues for orderly determination as provided in the NLRA, it is appropriate, just and proper, that pending the final disposition of the matters pending before the Board, List, its officers, representatives, supervisors, agents, and all other persons acting on its behalf or in participation with it, shall be enjoined as set forth in this order granting temporary injunctive relief.

Pending the final disposition of the matters pending before the Board, List, its officers, representatives, supervisors, agents, and all other persons acting on its behalf or in participation with it, shall cease and desist from interfering with, restraining, or coercing its employees in the exercise of rights guaranteed to them under Section 7 of the NLRA, including:

(a) creating the impression that employees' union activities are under surveillance by List;

(b) threatening employees with termination for engaging in union activity;

(c) threatening to permanently replace employees in the event of a strike if they select the Union as their representative;

(d) telling employees that it would be futile to select the Union as representative because List will never negotiate with the Union;

(e) announcing stricter enforcement of work rules in response to employees' union activity;

(f) announcing wage increases to employees as an inducement for them to abandon their support for the Union;

(g) subjecting employees to closer scrutiny to discourage employees from supporting the Union; and

(h) suspending or discharging employees because of their union activity or support for the Union.

List shall, within fifteen (15) days of the issuance of this order, in writing, offer interim reinstatement to Jose Avelar and Juan Perez to their former positions. If those positions no longer exist, List shall offer Avelar and Perez substantially equivalent positions, displacing, if necessary, any employee who may have been hired or reassigned to replace them.

List shall immediately rescind the suspensions and discharges issued to Jose Avelar and Juan Perez, expunge them from their employment records, and not rely on them in assessing any future disciplinary actions.

List shall immediately recognize and bargain with the Union as the exclusive collective-bargaining representative of its employees in Unit:

> All full-time and regular part-time assembly employees, warehouse employees, production employees, shipping clerks and order processors employed by Respondent at Respondent's facility currently located at Warehouse Suite 2W, 101 45th Street in Munster, Indiana; excluding, all other employees, office clerical employees, and guards and supervisors as defined by the Act.

List shall, upon request, bargain in good faith with the Union as the exclusive bargaining representative of employees in the Unit concerning terms and conditions of employment until they reach a complete collective bargaining agreement or a good faith impasse in bargaining, and if any understanding is reached, List shall embody the understanding in a signed agreement.

List shall, within twenty-one (21) days of the Court's order, provide the Union with a list of current employees' names and addresses.

List shall provide the Union with notice of, and equal time and access to List's Munster facility to respond to any of List's meetings with employees about union representation.

List shall, within fifteen (15) days of the Court's order, convene the bargaining Unit employees during working time in the Munster facility, whereupon a responsible

management official, in the presence of a NLRB representative, will read the Court's order to employees. Upon request by the Union, List shall also provide a translated presentation of the order in Spanish and in other languages as necessary to ensure effective communication to employees, according to the same conditions.

List shall, within fifteen (15) days of the Court's order, post copies of the order at its Munster facility in all places where notices to employees are normally posted; maintain these postings during the NLRB's administrative proceeding free from all obstructions and defacements; grant all employees free and unrestricted access to said postings; and grant to agents of the NLRB reasonable access to the Munster facility to monitor compliance with this posting requirement. Upon request by the Union, List shall also post translated copies in Spanish and in other languages as needed to ensure effective communication to employees, according to the same conditions.

List shall, within twenty-eight (28) days of this order, file with the Court, with a copy sent to the Director, a sworn affidavit from a responsible List official setting forth with specificity the manner in which List has complied with the terms of the Court's order, including how and where the documents have been posted and the date and time the Court's order was read to employees and by whom.

**IT IS SO ORDERED.**

ENTERED: July 11, 2022.

    /s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT